AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| RENZO GADOLA | ) | Case No. 10-3525-White |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __March 2001-present__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida and elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 371 | unlawfully and knowingly conspired with others to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue, and one or more of such person committed any act to effect the object of the conspiracy. |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Adam C. Tucker, Special Agent IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7 7

*Judge's signature*

City and state:       Miami, Florida              Patrick A. White, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, ADAM C. TUCKER, being duly sworn, depose and say:

1.     I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS"). I have been employed with the IRS since approximately September 2009. I am currently assigned to a group that investigates tax fraud, including, among other crimes, conspiracies to defraud the United States. I have also participated in investigations that focus on the use of undeclared foreign bank accounts by United States taxpayers and other individuals who willfully conceal assets and income from the IRS. I also am familiar with the investigation of the structuring of the importation and exportation of U.S. currency in order to avoid certain cash and transaction reporting requirements.

2.     The information in this affidavit is based on my personal knowledge, information provided to me by others, including other law enforcement officials and civilian witnesses, as well as my review of documents associated with the case. I am fully aware of the facts and circumstances concerning this investigation and have participated in significant aspects of this investigation. In particular, I have reviewed: the Deferred Prosecution Agreement between the United States Department of Justice and UBS AG ("UBS"), a Swiss bank; Internal Revenue Service voluntary disclosures of undeclared offshore accounts; UBS bank records; e-mails, documents, phone recordings provided by UNITED STATES CLIENT, an unindicted co-conspirator; and a United States Customs Declaration signed by RENZO GADOLA upon entry into the United States on October 29, 2010. I also interviewed the UNITED STATES CLIENT.

3.     The information contained in this affidavit is submitted for the sole purpose of demonstrating probable cause to obtain a criminal complaint against RENZO GADOLA, for violating Title 18, United States Code, Section 371, conspiracy to defraud the United States.

Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not contain all of the information known to me and/or other law enforcement officers involved in this case.

**Duty to Report Worldwide Income and Foreign Bank Accounts**

4. The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States.

5. United States citizens, resident aliens, and legal permanent residents of the United States were required to file an individual income tax return with the IRS reporting their worldwide income for each year if their gross income exceeded a certain amount.

6. United States citizens, resident aliens, and legal permanent residents of the United States had an obligation to report to the IRS on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained. United States citizens and residents had an obligation to report all income earned from foreign bank accounts on the tax return.

7. United States citizens, resident aliens, and legal permanent residents of the United States who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign

Bank and Financial Accounts on Form TD F 90-22.1 (the "FBAR"). The FBAR for the applicable year was due by June 30 of the following year.

8. An "undeclared account" was a financial account maintained in a foreign country that has not been reported to the United States government on a tax return and an FBAR.

9. Individuals who physically transported, mailed or shipped, or caused to be physically transported, mailed, shipped or received, currency, traveler's checks, and certain other monetary instruments in an aggregate amount exceeding $10,000 from the United States to any place outside the United States or into the United States from any place outside the United States were required to file a FinCen Form 105, Report of International Transportation of Currency or Monetary Instruments ("CMIR"), with the Bureau of Customs and Border Protection.

10. United States law prohibited individuals from structuring transportation or shipment of U.S. currency into or out of the United States in amounts less than $10,000 if the purpose of the structuring was to evade the requirement to file a CMIR.

11. Any person who was engaged in a trade or business who in the course of such trade or business received more than $10,000 in coins or currency was required to file a Report of Cash Payments Over $10,000 Received in a Trade or Business, Form 8300 ("Form 8300 "), with respect to such transaction (or related transactions) with the Financial Crimes Enforcement Network of the U.S. Department of Treasury. United States law prohibited the willful failure to file a Form 8300.

## UBS AG'S CROSS BORDER BANKING SCHEME[1]

12. UBS, a corporation organized under the laws of Switzerland, directly and through its subsidiaries, operated a global financial services business. As one of the biggest banks in Switzerland and largest wealth managers in the world, UBS provided banking, wealth management, asset management and investment banking services, among other services, around the globe, including through branches located in the United States (including the Southern District of Florida).

13. Beginning in at least 2000 and continuing until 2007, UBS, through certain private bankers and managers in the U.S. cross-border business, participated in a scheme to defraud the United States and its agency, the IRS, by actively assisting or otherwise facilitating a number of U.S. individual taxpayers in establishing accounts at UBS in a manner designed to conceal the U.S. taxpayers' ownership or beneficial interest in said accounts. In this regard, said private bankers and managers facilitated the creation of such accounts in the names of offshore companies, allowing such U.S. taxpayers to evade reporting requirements and to trade in securities as well as other financial transactions (including making loans for the benefit of, or other asset transfers directed by, the U.S. taxpayers, and using credit or debit cards linked to the offshore company accounts).

14. Additionally, said private bankers and managers would actively assist or otherwise facilitate certain undeclared U.S. taxpayers, who such private bankers and managers knew or should have known were evading United States taxes, by meeting with such clients in

---

[1] The information in this section was obtained from the Deferred Prosecution Agreement between the Department of Justice and UBS AG dated February 19, 2009.

the United States and communicating with them via U.S. jurisdictional means on a regular and recurring basis with respect to their UBS undeclared accounts. This enabled the U.S. clients to conceal from the IRS the active trading of securities held in such accounts and/or the making of payments and/or asset transfers to or from such accounts.

15. Private bankers in UBS's U.S. cross-border business typically traveled to the United States with encrypted laptop computers and received training on how to avoid detection by U.S. authorities while traveling to the United States. UBS trained bankers traveling to the United States in techniques to avoid detection by United States law enforcement authorities, including training bankers to falsely state on customs forms that they were not traveling into the United States for business.

16. In approximately 2002, UBS began to implement procedures in order to comply with its Qualified Intermediary ("QI") agreement with the IRS. The QI agreement required the bank to verify the identity and citizenship/domicile of its clients and to withhold and pay over to the IRS taxes on certain accounts beneficially owned by United States taxpayers. Certain bankers were concerned that the QI agreement limited their ability to continue to aid an assist United States taxpayers to evade United States income taxes. Certain of these bankers left UBS and encouraged their clients to leave UBS and continued their cross-border tax evasion activities utilizing other banks that either did not have QI agreements or banks that had QI agreements but that were not adhering to the terms of the agreement.

17. In or around September of 2007, UBS was notified that the Department of Justice was investigating its United States cross-border banking activities.

18.     On February 18, 2009, UBS entered into a Deferred Prosecution Agreement ("DPA") with the U.S. Department of Justice ("DOJ") and a Consent Order with the U.S. Securities and Exchange Commission ("SEC"). As part of the DPA and Consent Order, UBS agreed to: pay a total of $780 million to the United States, $380 million representing disgorgement of profits from maintaining the U.S. cross-border business and $400 million representing U.S. federal backup withholding tax required to be withheld by UBS, together with interest and penalties, and restitution for unpaid taxes associated with certain account relationships involving fraudulent sham and nominee offshore structures and otherwise as covered by the DPA; exit the U.S. cross-border banking business; and pursuant to an order issued by the Swiss Financial Market Supervisory Authority, transfer to the DOJ information regarding accounts of certain U.S. clients based on evidence that the clients had committed tax fraud.

## **SWISS BANKER**[2]

19.     From the late 1990's through mid-2003, SWISS BANKER was a private banker and Executive Director for UBS's North America International business, which included the United States cross-border business. SWISS BANKER serviced hundreds of undeclared accounts at UBS that were owned and controlled by U.S. taxpayers. SWISS BANKER also met with United States clients at various locations in the United States and Switzerland to service their accounts.

---

[2] The information in this section was obtained from the Deferred Prosecution Agreement between the United States Department of Justice and UBS AG ("UBS"); Internal Revenue Service voluntary disclosures of undeclared offshore accounts; UBS bank records; e-mails, documents, and phone recordings provided by UNITED STATES CLIENT, an unindicted co-conspirator; and information learned during an interview of UNITED STATES CLIENT.

20.     In mid-2003, SWISS BANKER left UBS to continue to conduct private banking with Basler Kantonalbank, a bank headquartered in Basel, Switzerland, 18 branches that serviced customers in north-west Switzerland, and offices in Zurich and Berne that provided personal banking services.

21.     SWISS BANKER brought from UBS to Basler Kantonalbank over 100 United States clients who had undeclared accounts at UBS and who wished to continue to conceal their assets and income from United States authorities.  Some of these clients also continued to maintain account relationships with UBS.

22.     From a time unknown to the present, SWISS BANKER formed an asset management entity located in Zurich, Switzerland, and has held himself as an independent investment manager.  SWISS BANKER managed the investments of U.S. taxpayers who wished to conceal their assets and income from United States authorities by utilizing undeclared accounts.

## **RENZO GADOLA**[3]

23.     RENZO GADOLA is a Swiss citizen who attended college in the United States at Jacksonville University.  GADOLA has a United States Social Security Number and obtained a drivers' license from the State of California.  GADOLA is a registered investment advisor with the United States Securities and Exchange Commission.

---

[3] The information in this section was obtained from the Deferred Prosecution Agreement between the United States Department of Justice and UBS AG ("UBS"); Internal Revenue Service voluntary disclosures of undeclared offshore accounts; UBS bank records; e-mails, documents, and phone recordings provided by UNITED STATES CLIENT, an unindicted co-conspirator; and information learned during an interview of UNITED STATES CLIENT.

24. From the late 1990's through approximately 2008, RENZO GADOLA was a private banker and Executive Director in UBS's North America International business, which included the United States cross-border business. RENZO GADOLA serviced hundreds of undeclared accounts at UBS owned and controlled by U.S. taxpayers. SWISS BANKER made it known that he was working with RENZO GADOLA to market private banking services to United States clients.

25. In order to assist U.S. taxpayers to conceal their assets and income from United States authorities, RENZO GADOLA routinely traveled to the United States to meet with clients who maintained undeclared accounts at UBS. Among other places, RENZO GADOLA met in California, Florida and New York.

26. In order to assist U.S. taxpayers to conceal their assets and income from United States authorities, RENZO GADOLA routinely met in Switzerland with clients who maintained undeclared accounts at UBS.

27. RENZO GADOLA operates as an independent investment manager under the business name RG Investment Partner AG.

### THE IRS'S VOLUNTARY DISCLOSURE PROGRAM[4]

28. On or about March 26, 2009, the IRS announced that it would offer reduced penalties to those who participated in a voluntary disclosure program. The voluntary disclosure program was intended to serve as a vehicle for U.S. taxpayers with previously undeclared

---

[4] The information in this section was obtained from the Deferred Prosecution Agreement between the United States Department of Justice and UBS AG ("UBS"); Internal Revenue Service voluntary disclosures of undeclared offshore accounts; UBS bank records; e-mails, documents, and phone recordings provided by UNITED STATES CLIENT, an unindicted co-conspirator; and information learned during an interview of UNITED STATES CLIENT.

8

accounts to contact the IRS and resolve their tax matters. These U.S. taxpayers had not previously disclosed either their ownership over the accounts or the receipt of income generated by those accounts, in violation of Titles 26 and 31 of the United States Code. Approximately 15,000 U.S. taxpayers made voluntary disclosures under this program to the IRS.

29. Twelve U.S. taxpayers with previously undeclared accounts disclosed to the IRS that, at one point, RENZO GADOLA managed their investments that had a total asset value of not less than $18,100,000 and not more than $46,000,000. Further, records produced by UBS pursuant to the Deferred Prosecution Agreement indicated that RENZO GADOLA managed undeclared accounts for a U.S. taxpayer that, as of December 31, 2004, had assets in excess of $19,000,000.

30. Twenty-one U.S. taxpayers with undeclared accounts disclosed to the IRS that, at one point, SWISS BANKER managed their investments that had a total asset value of not less than $35,100,000 and not more than $101,500,000.

31. U.S. taxpayers with undeclared accounts at, among other places, UBS and Basler Kantonalbank that were managed by SWISS BANKER discussed with SWISS BANKER their intention to disclose those undeclared accounts to U.S. authorities through the IRS's Voluntary Disclosure Program. SWISS BANKER discouraged the U.S. taxpayers from disclosing the undeclared accounts to the IRS.

32. SWISS BANKER discussed with U.S. taxpayers with undeclared accounts schemes to repatriate the contents of the undeclared accounts in a manner intended to conceal from the IRS the source, nature, and ownership of the contents of the undeclared accounts.

## UNITED STATES CLIENT[5]

33.     In or about 1999, UNITED STATES CLIENT ("U.S. CLIENT") and his siblings inherited an undeclared account at UBS from their recently-deceased mother. In or about March 2000, in Atlanta, Georgia, U.S. CLIENT and his siblings met with SWISS BANKER to discuss the undeclared account. SWISS BANKER verified that the account was undeclared and informed U.S. CLIENT and his siblings that they would need to travel to Zurich, Switzerland to assume ownership of the undeclared account.

34.     In or about March 2001, U.S. CLIENT and his siblings met with SWISS BANKER at UBS headquarters in Zurich, Switzerland to discuss the undeclared account. SWISS BANKER introduced U.S. CLIENT and his siblings to B.S., a Swiss financial advisor utilized by UBS to create nominee entities in tax haven jurisdictions for U.S. taxpayers in order to conceal assets and income from the IRS. B.S. created a British Virgin Islands bearer share corporation for U.S. CLIENT and his siblings, opened an account at UBS in the name of that entity, and transferred into that account the contents of the account at UBS owned by U.S. CLIENT and his siblings. From March 2001 forward, B.S. actively managed the nominee entity account owned by U.S. CLIENT and his siblings.

35.     U.S. CLIENT met with SWISS BANKER in Zurich, Switzerland on a number of occasions between 2002 and 2006 and discussed the undeclared account at UBS.

36.     In or about 2002 or 2003, SWISS BANKER informed U.S. CLIENT that he was

---

[5] The information in this section was obtained from UBS bank records; e-mails, documents, and phone recordings provided by UNITED STATES CLIENT, an unindicted co-conspirator; information learned during an interview of UNITED STATES CLIENT; and the meeting between UNITED STATES CLIENT and Gadola.

10

leaving UBS and taking approximately 150 clients with him. SWISS BANKER did not take the account at UBS controlled by U.S. CLIENT and his siblings.

37. In or about Summer 2006, SWISS BANKER met with U.S. CLIENT in Mississippi to analyze the assets and liabilities of U.S. CLIENT and prepare an estate plan for U.S. CLIENT. During the discussions, U.S. CLIENT revealed that over a number of years he had accumulated a substantial cash hoard that he kept in a safe deposit box.

38. In or about January 2007, as directed by SWISS BANKER, U.S. CLIENT traveled to New Orleans, Louisiana and in a hotel room gave SWISS BANKER one-half of his cash hoard, approximately $200,000 in cash. No Form 8300 was filed with the United States Treasury reporting this transaction.

39. On or about April 26, 2007, as directed by SWISS BANKER, U.S. CLIENT traveled to New Orleans, Louisiana and in a hotel room provided SWISS BANKER with the remainder of his cash hoard. SWISS BANKER provided U.S. CLIENT with a receipt for $245,000 in cash. The receipt noted: "Bank: BKB ZH." No Form 8300 was filed with the United States Treasury reporting this transaction. While still in the United States, SWISS BANKER distributed the cash from U.S. CLIENT to his other United States clients.

40. In or about August 2007, at the request of SWISS BANKER, U.S. CLIENT traveled to Switzerland to set up another undeclared bank account.

41. In or about September 2007, SWISS BANKER caused to be opened at Basler Kantonalbank an account whose beneficial owner was U.S. CLIENT. SWISS BANKER caused Swiss Francs and United States securities to be transferred into this account.

42. In or about Spring of 2009, U.S. CLIENT traveled to Zurich, Switzerland and signed certain documents to close his account at Basler Kantonalbank. SWISS BANKER SWISS BANKER told U.S. CLIENT that the funds went into SWISS BANKER's business account and that he would wire transfer the funds to U.S. CLIENT in the United States. To date, the funds have not been wire transferred to the United States.

43. In or about September 2009, U.S. CLIENT called SWISS BANKER to inform SWISS BANKER that he was participating in the IRS's Voluntary Disclosure Program. SWISS BANKER told U.S. CLIENT he did not need to participate in the Voluntary Disclosure Program because his accounts were too small and the account that U.S. CLIENT shared with his siblings was a family account. SWISS BANKER also told U.S. CLIENT that even if he did disclose to the IRS the UBS account, he should not disclose his account at Basler Kantonalbank as disclosure would bring trouble for both of them.

44. After the September 2009 conversation, SWISS BANKER repeatedly called U.S. CLIENT in the United States to dissuade him from disclosing his Basler Kantonalbank account to the IRS. During one of the calls, SWISS BANKER told U.S. CLIENT that only five of his clients had applied for the Voluntary Disclosure Program and that entering into the program was unnecessary.

45. In or about September 2009, U.S. CLIENT informed SWISS BANKER that he and his siblings met with an attorney in order to enter into the Voluntary Disclosure Program. SWISS BANKER proposed that U.S. CLIENT provide the attorney with false explanations regarding the source of the funds in the Basler Kantonalbank account. Among other things, SWISS BANKER proposed that he could create fake bank records that would misrepresent the

funds as the proceeds of a loan.

46. Throughout the Spring of 2010, U.S. CLIENT requested that SWISS BANKER wire transfer his funds to either him or his attorney. SWISS BANKER refused to wire transfer the funds to the United States. Instead, SWISS BANKER requested that U.S. CLIENT travel to Zurich, Switzerland and retrieve the funds in cash.

47. On June 1, 2010, SWISS BANKER sent an email message to U.S. CLIENT in which he stated that U.S. CLIENT's funds could be repatriated to the United States either by physical transportation or by a wire transfer. SWISS BANKER cautioned that if funds were wired into the United States it would have to be done so under their loan proceeds scheme.

48. On or about August 16, 2010, in a telephone conversation recorded by U.S. CLIENT regarding U.S. CLIENT'S assets in Switzerland, SWISS BANKER advised U.S. CLIENT not to disclose his account. Instead, SWISS BANKER suggested that U.S. CLIENT keep the money in Switzerland and over time repatriate the funds in small amounts in cash. SWISS BANKER expressed a reluctance to discuss any details of the repatriation scheme over the phone.

49. On September 22, 2010, in a telephone conversation recorded by U.S. CLIENT, SWISS BANKER stated that his partner "Renzo" would be in the United States and could meet with U.S. CLIENT and act as a go-between for communications between U.S. CLIENT and SWISS BANKER. SWISS BANKER stated that "Renzo" traveled to the United States "very, very regularly" and that "Renzo" would visit Florida, New York, "and is eager to go all the way to the West Coast."

50.     On September 28, 2010, SWISS BANKER sent an email message to U.S. CLIENT in which he stated:

> My partner Renzo will be in Florida during the first half of Nov[ember]. Exact dates are not available yet. I will get back to you later to fix an appointment.

51.     On or about October 25, 2010, SWISS BANKER sent an email message to U.S. CLIENT in which he stated:

> My partner Renzo will be in Florida from Nov. 6 - 10 and would like to meet with you. He is staying at the Mandarin Oriental Miami. He could update you on some of the pendings.

52.     On October 29, 2010, SWISS BANKER sent an email message to U.S. CLIENT, copying RENZO GADOLA, in which SWISS BANKER stated:

> I am copying my partner Renzo Gadola on this mail. This way you two can make detailed arrangements. I gave him your phone number and suggest that he will contact you. He left for the U.S. yesterday. I think his first stop is in NYC. I informed him about our past relationship and gave him my advice that he will discuss with you.

53.     On or about October 29, 2010, at Dulles International Airport in Sterling, Virginia, upon his entry to the United States, RENZO GADOLA signed a Customs Declaration on which he stated "no" to a question asking if the primary purpose of his trip to the United States was business.

54.     On November 1, 2010, RENZO GADOLA sent an email message (from domain name "zurichinvestmentparter.com") to U.S. CLIENT, on which he copied SWISS BANKER and himself (at e-mail account with domain name "rgipag.com") stating that he would be in Miami, Florida from November 6, 2010 to November 9, 2010 and that he could meet with U.S.

14

CLIENT.

55.   On November 3, 2010, RENZO GADOLA sent an email message to U.S. CLIENT, on which he copied SWISS BANKER, in which he requested to meet with U.S. CLIENT on November 6, 2010 at 1 p.m. at the Mandarin Oriental Hotel in Miami, Florida.

56.   On November 6, 2010, U.S. CLIENT met with RENZO GADOLA at the Mandarin Oriental Hotel in Miami. During the meeting, RENZO GADOLA advised U.S. CLIENT that SWISS BANKER had provided him with information relating to U.S.. CLIENT's situation with the Internal Revenue Service. RENZO GADOLA stated that he understood that U.S. CLIENT's UBS account information had been turned over to United States authorities and therefore U.S. CLIENT had to disclose the UBS account to the Internal Revenue Service through a voluntary disclosure. RENZO GADOLA further assured the client that U.S. CLIENT should not disclose his undeclared account with SWISS BANKER at Basler Kantonalbank in Switzerland because unlike UBS, Basler Kantonalbank had no branches in the United States and therefore could not be pressured by United States authorities to disclose United States undeclared account information.

57.   On November 6, 2010, during the meeting with U.S. CLIENT at the Mandarin Oriental, RENZO GADOLA was observed with a soft-sided black leather briefcase with a shoulder strap. RENZO GADOLA was earlier observed with the same briefcase during a meeting with another individual in the same restaurant.

58.   On November 6, 2010, during the meeting with U.S. CLIENT at the Mandarin Oriental, RENZO GADOLO telephoned SWISS BANKER from his cell phone, which U.S. CLIENT believed to be an I-PHONE. During the telephone call, U.S. CLIENT and SWISS

BANKER discussed how U.S. CLIENT could repatriate funds from his undeclared bank account into the United States. After the telephone call with SWISS BANER, RENZO GADOLA stated that U.S. CLIENT's money was no longer deposited with Basler Kantonalbank, but instead maintained at a safe located at SWISS BANKER's offices in Zurich. U.S. CLIENT had previously received emails from RENZO GADOLA sent after RENZO GADOLA's entry into the United States.

59.   On November 6, 2010 during the meeting with U.S. CLIENT, RENZO GADOLA stated that he was scheduled to meet with clients in Boston, Massachusetts next week.

## CONCLUSION

60.   Based upon the foregoing, there is probable cause to believe that, from in or about March 2001 to the present, RENZO GADOLA, SWISS BANKER, and U.S. CLIENT, unlawfully and knowingly conspired with each other, and others, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue, and one or more of such person committed any act to effect the object of the conspiracy.

_____
ADAM C. TUCKER
SPECIAL AGENT, IRS-CI

Subscribed and sworn before me no this
7th day of November, 2010, in Miami, Florida

_____
PATRICK A. WHITE
UNITED STATES MAGISTRATE JUDGE